UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Shireen Walsh,

Plaintiff,

vs.

National Computer Systems, Inc.,

Defendant.

Civil No. 00-82 JMR/FLN

**REPORT AND RECOMMENDATION**

---

Diane Odeen, Esq., for Plaintiff.
Richard Ross, Esq., for Defendant.

---

**THIS MATTER** came for a hearing before the undersigned United States Magistrate Judge on May 16, 2001, on Defendant National Computer Sys., Inc.'s ("NCS") Motion for Partial Summary Judgment [#60]. The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons which follow, this Court will recommend that the motion be granted in part and denied in part.

## I. FACTUAL BACKGROUND

This action arises from the alleged discriminatory conduct and hostile work environment that Plaintiff Shireen Walsh ("Ms. Walsh") experienced because of her supervisor, Ms. Barbara Mickelson ("Ms. Mickelson"), during her employment at NCS. (See Pl.'s Mem. in Opp'n to Mot. for Partial Summ. J. at 2-4 ("Pl.'s Opp'n Mem.").) In considering NCS' Motion, the facts are recounted from a fair reading of Ms. Walsh's version of the evidence. See Manning v. Metropolitan Life Ins. Co., Inc., 127 F.3d 686, 689 (8th Cir. 1997).

Ms. Walsh began her employment with NCS on or about May 4, 1993, as a Payroll Assistant

JUL 16 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

at NCS's Eden Prairie facility. (See Pl.'s Opp'n Mem. at 3; see also Def.'s Mem. in Supp. of Mot. for Summ. J. at 2 ("Def.'s Supp. Mem.").) On April 17, 1995, she accepted a promotion to the position of Account Representative II in NCS's Customer Service Department and was classified as an exempt employee who was ineligible for overtime payments. (See Pl.'s Opp'n Mem. at 2.) Ms. Walsh's normal work day began at 8:00 a.m. and ended at 5:00 p.m. (See Def.'s Supp. Mem. at 2.)

According to Ms. Walsh, Ms. Mickelson began managing the Customer Service Department on March 1, 1997, and from that point onwards subjected her to differential treatment. (See Pl.'s Opp'n Mem. at 2.) For example, Ms. Walsh complains that Ms. Mickelson mandated that she provide advance notice of medical appointments and produce appointment cards; however, none of the other Account Representatives with medical appointments had to comply with these procedures. (Id., Odeen Aff., Ex. D.) On April 3, 1997, Ms. Walsh began her pregnancy leave and was absent from work for approximately fifteen weeks (See Pl.'s Opp'n Mem. at 4.)

Upon her return to work on August 4, 1997, Ms. Walsh complains that she was subjected to conduct that was demeaning, threatening and discriminatory. (Id.) For example, Ms. Mickelson notified Ms. Walsh that the other Account Representatives were being given a half-day off on August 8, 1997. (Id.) Ms. Walsh was informed that she would have to remain in the office and answer the telephones because her colleagues were being rewarded for assuming her workload while she was on maternity leave. (Id.) Ms. Walsh complains that while the Account Representatives often assumed a vacationing or indisposed colleague's workload, they were never rewarded for doing so. (Id.)

Ms. Walsh's relationship with Ms. Mickelson worsened when her request to adjust her work schedule to accommodate day-care considerations was denied. (Id.) According to Ms. Walsh, this

was further proof that she was being unfairly singled out since the other Account Representatives responsible for the same time zone were granted schedule adjustments. (See Pl.'s Opp'n Mem. at 4.) Although Ms. Mickelson finally granted Ms. Walsh's request, she scrutinized Ms. Walsh's hours and would often stand outside Ms. Walsh's cubicle looking at her watch, commenting on her hours or reprimanding her for speaking to co-workers about work-related issues. (Id. at 5-6.) Furthermore, Ms. Mickelson often publicly commented on whether Ms. Walsh was pregnant and made other disparaging, insensitive and inappropriate remarks about Ms. Walsh's son. (Id. at 5-7.)

Despite the above mentioned incidents, the primary issue of contention between Ms. Mickelson and Ms. Walsh concerned her use of sick leave. (Id.) As an exempt employee, Ms. Walsh was entitled to take unlimited paid sick leave for personal or family related medical needs. (See Pl.'s Opp'n Mem. at 8.) However, Ms. Mickelson required Ms. Walsh to offset partial day absences for medical appointments and submit a spreadsheet tracking her hours. (Id.) Ms. Walsh contends that no other exempt employee supervised by Ms. Mickelson was required to offset partial day absences for medical appointments or other personal absences, such as taping television shows, getting haircuts, mowing lawns, or running errands. (Id.) Several of Ms. Walsh's colleagues' deposition testimony indicated that Ms. Mickelson was also very insensitive about Ms. Walsh's son's medical needs and was often angry when Ms. Walsh had to leave work to care for her son. (Id.) On one such occasion, although Ms. Mickelson knew that Ms. Walsh's son had undergone ear surgery and a frenectomy[1] the previous day, she was angered by Ms. Walsh's departure to care for her son. (Id. at 8-9.)

---

[1] A frenectomy is an extension of the frenum. See DORLAND'S MEDICAL DICTIONARY 664 (28th ed. 1994).

On or about October 27, 1997, Ms. Walsh reported the differential treatment she experienced with respect to her use of sick leave to NCS' Personnel Manager, Mike McRath ("Mr. McRath"). (See Pl.'s Opp'n Mem. at 9-10.) Mr. McRath explained that as an exempt employee, she did not have to offset partial day absences for medical appointments and would discuss her concerns about differential treatment with Ms. Mickelson. (Id.) Mr. McRath subsequently sent Ms. Walsh an email stating that the issue was within Ms. Mickelson's discretion.[2] (Id.)

On or about October 29, 1997, two days after Ms. Walsh's report about Ms. Mickelson's differential treatment, she was assigned all accounts in Texas, the state with the second-highest number of contracts. (Id.) This assignment increased Ms. Walsh's workload without a corresponding reduction in her work quota and did not result in a promotion to the grade level and salary of the employee formerly responsible for Texas. (Id.) When Ms. Walsh asked Ms. Mickelson about an increase in salary and grade level, she was only promised the latter. (Id.). A few months later, Ms. Mickelson apparently asked Ms. Walsh to assume responsibility for an important account that another colleague had neglected. (See Pl.'s Opp'n Mem. at 9-10.) Although Ms. Walsh successfully completed the assignment, it caused her to miss her work quota. (Id.) Consequently she failed to receive a bonus and was never granted an adjustment of her quota or rewarded for her efforts. (Id.) According to Ms. Walsh, it was around this time that her colleagues distanced themselves from her because they noticed Ms. Mickelson's differential treatment and became wary of associating with Ms. Walsh. (Id. at 11.)

---

[2] Although the record is unclear, it appears that Ms. Mikelson reported Ms. Walsh's alleged unsatisfactory performance to the Personnel Department, after Mr. McRath spoke to her about Ms. Walsh's concerns. (Id.)

On or about June 9, 1998, the frayed relationship between Ms. Mickelson and Ms. Walsh unraveled further when they exchanged words regarding their work-environment at a department meeting. (Id.) Ms. Walsh alleges that she left the meeting in tears after Ms. Mickelson yelled profanities at her and pounded her fists on the table. (Id.) On the following day, Ms. Mickelson scheduled a meeting with Ms. Walsh to discuss what had transpired at the department meeting. (Id.) Ms. Walsh avers that she asked to be treated like her colleagues with respect to having to make up time for medical appointments and was informed by Ms. Mickelson that the issue was up to her discretion. (Id.) Due to time constraints, both parties agreed to end the meeting and resume at 1:30 p.m.; however, Ms. Mickelson cancelled the 1:30 p.m. meeting and never rescheduled it. (See Pl.'s Opp'n Mem. at 11.) Later that day, Ms. Walsh reported Ms. Mickelson's continued differential treatment to Bruce Haseley ("Mr. Haseley"), NCS' Personnel Director. (Id.)

In the ensuing months, Ms. Walsh made several other reports regarding Ms. Mickelson's discriminatory treatment to the Personnel Department. (Id.) According to Ms. Walsh, although she reported the differential treatment she received with respect to her use of sick leave and complained of a hostile work environment, Mr. Haseley told her that he could not "take sides" in the dispute. (Id.) One of the reports on October 9, 1998, stemmed from another disagreement in a department meeting concerning the workload created by two of the four Account Representatives transferring to other NCS departments. (See Pl.'s Opp'n Mem. at 12-13.) Ms. Mickelson allegedly became irate and abusive when Ms. Walsh queried her about having to assume the extra work and still offset the time she used for medical appointments.[3] (Id.) As a result, Ms. Walsh walked out of the meeting.[4]

---

[3] According to Ms. Walsh, Ms. Mickelson stated that "if it takes you two working twenty-four hours a day to get the work done, then that's what you will have to do" and began screaming

(Id.) Shortly after this meeting, both parties met with Mr. Haseley to discuss their dispute, but, neither Ms. Mickelson nor Mr. Haseley could give Ms. Walsh any assurances that her concerns would be addressed. (Id.)

Following this incident, Ms. Walsh began searching for another position. On October 16, 1998, she went with a colleague, Ms. Eckstrom, to speak to Mr. Haseley about the hostile work environment and Ms. Mickelson's differential treatment. (Id.) According to Ms. Walsh, although Ms. Eckstrom supported her complaints of differential treatment and the animosity it caused in the department, Mr. Haseley indicated that he was not able to "take sides" but would possibly discuss the situation with Ms. Mickelson. (Id.)

A few days later, Ms. Walsh accepted a position with another company and tendered her resignation on October 19, 1998. (Id.) Ms. Walsh subsequently re-considered her resignation and contacted Mr. Haseley to discuss her return with the condition that the Personnel Department resolve her disputes with Ms. Mickelson. (See Pl.'s Opp'n Mem. at 14.) Ultimately Mr. Haseley declined Ms. Walsh's offer to withdraw her resignation after Ms. Mickelson expressed her desire to continue with the resignation. (Id.) Ms. Walsh's last day at NCS was on October 30, 1998. (Id.)

On November 10, 1998, Ms. Walsh received a telephone call from Stephen Finn ("Mr. Finn"), NCS' Director of Sales Operations, informing her of two NCS sales positions he felt would suit her. (Id. at 15.) Later that evening, he drove to her home to discuss the positions and visited a few days later with more information. (Id.) According to Ms. Walsh, Mr. Finn encouraged her

---

profanities and pounding her fists on the table. (See Walsh Depo. Pg. 236-239.)

[4] Ms. Mickelson met with Ms. Walsh ten minutes later to discuss their dispute; however, Ms. Walsh asked to have a Personnel Representative present. (See Pl.'s Opp'n Mem. at 12-13.)

to apply for one of the positions and told her it would be "a good career path" for her. (Id.) On November 16, 1998, Ms. Walsh applied for one of the positions, was interviewed and also took a test required for all applicants. (Id.) During several follow-up calls to Mr. Finn following the interview, Ms. Walsh was informed that she did "just fine" and would be contacted as soon as NCS made a decision. (Id.) During this time frame, Ms. Eckstrom informed Ms. Walsh that she had overheard Ms. Mickelson speaking to Mr. Finn about Ms. Walsh. (See Pl.'s Opp'n Mem. at 15.) Ultimately the position was offered to another non-NCS candidate. (Id.) Ms. Walsh was informed that she was not offered the position because she did not possess enough product knowledge, even though NCS usually trained its new employees.

NCS has moved for partial summary judgment with respect to Ms. Walsh's claims of sex discrimination in violation of Title VII, the Minnesota Human Rights Act ("MHRA"), the Family and Medical Leave Act ("FMLA"), the Minnesota Parenting Leave Act ("MPLA"); and the Minnesota Sick or Injured Child Care Leave Act ("MSICLA").

## II. CONCLUSIONS OF LAW

### A. Defendant NCS' Motion for Partial Summary Judgment [#60].

#### 1. Standard of Review

The Supreme Court has held that summary judgment is to be used as a tool to isolate and dispose of claims or defenses that are either factually unsupported or based on undisputed facts. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Hegg v. U.S., 817 F.2d 1328, 1331 (8th Cir. 1987); Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 919 (8th Cir. 2000). Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986) (holding that the Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). When considering a motion for summary judgment, a court should construe all evidence in favor of the non-moving party. See Anderson, 477 U.S. at 255. However, if the evidence submitted by the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. Id. at 249-50.

The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. Id. at 248-49. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48. If the opposing party fails to carry that burden, summary judgment should be granted. See Celotex, 477 U.S. at 322. Summary Judgment should "[s]eldom be granted in discrimination cases." Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir. 2000).

**2. Legal Analysis**

**a. Constructive Discharge under Title VII and the Minnesota Human Rights Act.**

Title VII of the Civil Rights Act of 1964 and the MHRA make it unlawful for an employer to discharge "or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."

42 U.S.C. § 2000e- 2(a)(1); see also Minn. Stat. § 363.03, subd. 1(2) and (5). As amended by the Pregnancy Discrimination Act, sex discrimination under Title VII includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Similarly, the MHRA prohibits discrimination against "women affected by pregnancy, childbirth, or disabilities related to pregnancy or childbirth." Minn. Stat. § 363.03, subd. 1(5). This Court's analysis is the same for both state and federal claims because Minnesota state courts apply the principles developed in adjudications under the federal employment discrimination statutes. See Sigurdson v. Isanti County, 386 N.W.2d 715, 719 (Minn. 1986); Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 574 (8th Cir. 1997).

Ms. Walsh's claims are properly analyzed under a disparate treatment theory insofar as she claims that as a result of taking pregnancy leave, NCS subjected her to criticism, differential treatment and general harassment in the workplace. See Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998). Because Ms. Walsh presents no direct evidence[5] of NCS' discriminatory intent, her claims are appropriately analyzed under the familiar, burden-shifting frame-work set forth in the McDonnell Douglas line of cases. See id. at 856; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08 (1993); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Under the McDonnell Douglas analysis, "the plaintiff creates an inference of intentional discrimination by establishing the prima facie case." Hutson v. McDonnell Douglas, 63 F.3d 771,

[5] "Direct" evidence is that which demonstrates "a specific link between the discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision." Phillipp v. ANR Freight Sys., Inc., 61 F.3d 669, 673 (8th Cir. 1995), quoting Stacks v. Southwestern Bell Yellow Pages, Inc., 996 F.2d 200, 201 n. 1 (8th Cir. 1993).

776 (8th Cir. 1996). The elements of a prima facie case are not inflexible and vary slightly with the specific facts of each case. See Hindman v. Transkrit Corp., 145 F.3d 986, 990-91 (8th Cir. 1998). In these circumstances, in order to make a prima facie case, Ms. Walsh must show: 1) she was a member of a protected class; 2) she was qualified for her position; and 3) she was discharged under circumstances giving rise to an inference of discrimination. See Bergstrom-Ek, 153 F.3d at 856.

Once the plaintiff has fulfilled that prima facie showing, "a rebuttable presumption of discrimination arises and the burden of production shifts" to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action. Breeding v. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999); McDonnell Douglas Corp., 441 U.S. at 802; Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). If the employer articulates such a reason, the plaintiff must then demonstrate that the employer's stated reason is pretextual and that the real reason for the employer's adverse employment action was unlawful discrimination. See Bergstrom-Ek, 153 F.3d at 857-58. However, should the employer be unable to provide such a reason for its decision, then the employee is entitled to a finding of intentional discrimination. See St. Mary's Honor Ctr., 509 U.S. at 510 n. 3. Under this burden-shifting approach, the plaintiff retains the ultimate burden of persuasion that the employer's proffered reason is pretextual, and that the plaintiff has, in fact, been a victim of intentional discrimination. Id. at 506-12; accord, Hasnudeen v. Onan Corp., 552 N.W.2d 555, 557 (Minn. 1996) (construing the MHRA).

In the instant case, Ms. Walsh has clearly established the first two elements of her prima facie case. As a woman, she is a member of a class protected by the MHRA. Second, NCS does not dispute that Ms. Walsh was qualified for her position as an Account Representative. In fact, NCS' Counsel argues that Ms. Walsh often received salary increases as a result of her satisfactory

evaluations and there is no indication that NCS considered her to be ill-suited for her position. Since NCS did not actually terminate Ms. Walsh, she must satisfy the third element by establishing that she was constructively discharged, under circumstances giving rise to an inference of discrimination. See Bergstrom-Ek, 153 F.3d at 858.

A constructive discharge occurs when an employee resigns in order to escape intolerable working conditions caused by illegal discrimination. See Bergstrom-Ek, 153 F.3d at 856 (8th Cir. 1998). Because "[c]onstructive discharge is a companion tort," Ms. Walsh must establish some underlying illegal act to maintain that claim. Huyen v. Discoll, 479 N.W.2d 76, 81 (Minn. Ct. App. 1991), rev. denied (Minn., February 10, 1992) (citing Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 428 (8th Cir. 1984)). To "show 'constructive discharge, a plaintiff must show more than just a Title VII [or MHRA] violation by her employer.'" Breeding, 164 F.3d at 1159 (quoting Phillips v. Taco Bell Corp., 156 F.3d 884, 890 (8th Cir. 1998)). A constructive discharge occurs "when an employer deliberately renders the employee's working conditions intolerable and thus forces [her] to quit [her] job." Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981); see also Johnson v. Runyon, 137 F.3d 1081, 1083 (8th Cir. 1998). "'Constructive discharge plaintiffs . . . satisfy Bunny Bread's intent requirement by showing their resignation was a foreseeable consequence of their employers' discriminatory actions.'" Bergstrom-Ek, 153 F.3d at 857 (quoting Hukkanen v. Int'l Union of Operating Eng'rs, 3 F.3d 281, 285 (8th Cir. 1993)). A plaintiff must show that a reasonable person would find the working conditions intolerable, which is judged by an objective standard, not the plaintiff's subjective feelings. See Phillips, 156 F.3d 884 at 890 (citing Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 796 (8th Cir. 1996)). A plaintiff's resignation is not a "reasonably foreseeable consequence" of the employer's action, if she "quits without giving her

employer a reasonable chance to work out a problem." Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998); Breeding, 164 F.3d at 1159 (an "employee has an obligation to act reasonably by not assuming the worst and not jumping to conclusions too quickly.").

In viewing the evidence in the light most favorable to Ms. Walsh, this Court believes that the undisputed evidence creates genuine issues of material fact regarding the circumstances surrounding Ms. Walsh's resignation. Ms. Mickelson held Ms. Walsh up to standards that were contrary to NCS' policies and inapplicable to the other employees she supervised. When Ms. Walsh initially complained to the Personnel Department about the differential treatment she experienced: (1) an increase in her workload without a corresponding salary raise; (2) scrutiny of her behavior in the workplace more closely than the other employees; and (3) publicly disparaging remarks about whether she was pregnant and her son's medical condition. The evidence establishes that a reasonable person could find NCS' working conditions intolerable and that Ms. Mickelson acted with the intention of forcing Ms. Walsh to resign or that her resignation was a reasonably foreseeable consequence of Ms. Mickelson's differential treatment, harassment, criticism and disparaging remarks.

Moreover, Ms. Walsh gave NSC numerous reasonable opportunities to improve her work conditions. For example, the evidence establishes that Ms. Walsh made several complaints to the Personnel Department about being the only employee required to offset partial day absences. Although the Personnel Department agreed that Ms. Mickelson's actions were contrary to NCS' policies, nothing was done to rectify the situation and stop the differential treatment. All this evidence, coupled with Ms. Walsh's numerous and repeated complaints to the Personnel Department about Ms. Mickelson's actions, could support a finding that NCS' conduct created the compulsion

to quit that is necessary for a constructive discharge.

A reasonable jury could infer that the criticisms, humiliation and general harassment Ms. Walsh experienced after reporting her concerns of differential treatment as a result of taking her pregnancy leave and attending medical appointments were motivated by a discriminatory animus on NCS's part, and support a finding of constructive discharge. Consequently this Court rejects NCS' contention that the evidence does not support a finding of constructive discharge and will recommend that NCS' Motion for Partial Summary Judgment with respect to this claim be denied.

**b. Discriminatory Failure to Hire under Title VII and the Minnesota Human Rights Act.**

If Ms. Walsh's claim is viewed as one involving a discriminatory failure to hire, then she must establish the following elements of a prima facie case: (1) that she is a member of a protected class; (2) that she applied for a job for which the employer was seeking application; (3) that she was rejected; and (4) that, after her rejection, the employer continued to seek applicants with the plaintiff's qualifications. See Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1223 (8th Cir. 1997). A prima facie case of discrimination, "combined with sufficient evidence for a reasonable factfinder to reject the employer's non-discriminatory explanation for its decision," creates a question of fact which precludes summary judgment. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

In the instant case, this Court believes that Ms. Walsh has made a prima facie showing of discriminatory failure to hire: (1) as a woman, she is a member of a protected class; (2) Mr. Finn courted her to apply for one of the two sales positions; (3) she was rejected; and (4) the second sales position remained open.

The Court assumes that Ms. Walsh can establish each of these elements and, therefore, the analysis proceeds to Step Two of the McDonnell Douglas paradigm, where, as noted above, NCS is obligated to present a legitimate, and nondiscriminatory, rationale for its challenged decision -- that is, its decision not to hire Ms. Walsh for the sales position. Giving NCS the benefit of every conceivable doubt, the Court concludes that it has satisfied this burden, since NCS claims that the person hired for the position was better qualified and Ms. Walsh's lack of product knowledge played a role in the hiring decision.

In turning to Step Three of the analysis, this Court believes that Ms. Walsh has presented evidence suggesting that NCS' stated rationale for its hiring decision was pretextual. First, the person hired for the position was an external candidate and the usual procedure was to train each candidate after they were hired. Second, Ms. Walsh was informed by Ms. Eckstrom that Ms. Mickelson had spoken to Mr. Finn contemporaneously with Ms. Walsh's interview. Although NCS correctly notes that Ms. Eckstrom did not know what was discussed, the fact that Mr. Finn courted Ms. Walsh for the position, drove to her home on at least two occasions to encourage her application and stated that it would be a "good fit" and "good career path for her" suggests that NCS' stated rationale for its hiring decision may have been pretextual.

Accordingly, this Court believes that as in Reeves, Ms. Walsh has presented sufficient evidence for a reasonable factfinder to reject the employer's non-discriminatory explanation for its decision and created a question of fact which precludes summary judgment.

**c. Reprisal under the MHRA and Title VII.**

Title VII prohibits employers from retaliating against employees who oppose unlawful employment practices; assist others in asserting their employment rights and make charges,

testify, assist or participate in any manner in an investigation, proceeding, or hearing under Title VII. See 42 U.S.C. § 2000e-3(a).[6] Moreover, under Title VII and the MHRA, such claims are evaluated under the three-part McDonnell-Douglas framework. See Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980), cert. denied, 450 U.S. 979 (1981); Hubbard v. United Press Int'l Inc., 330 N.W.2d 428, 444 (Minn. 1983). Accordingly, Ms. Walsh must establish a prima facie case of retaliation by demonstrating that: (1) she engaged in a protected activity; (2) an adverse employment action occurred; and (3) that a causal connection is established between the two. See Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 ( 8th Cir. 1998); Stevens v. St. Louis Univ. Med. Ctr., 97 F.3d 268, 270 (8th Cir. 1996); Sweeny v. City of Ladue, 25 F.3d 702, 703 (8th Cir. 1994); Sherpell v. Humnoke Sch. Dist. No. 5, 874 F.2d 536, 540 (8th Cir. 1989).

In keeping with the McDonnell-Douglas test, once Ms. Walsh has made a prima facie showing of retaliation, the burden shifts to NCS to articulate a legitimate, non-discriminatory reason for the challenged action. See Womack, 619 F.2d at 1296. NCS is not required to prove the absence of a retaliatory motive, but must only produce evidence that would dispel the inference of retaliation by establishing the existence of a legitimate reason for the challenged action. Id. If the employer satisfies this burden of production, then to prevail, the employee must demonstrate that the proffered justification is actually a pretext for retaliation. Id.

In viewing the evidence in the light most favorable to Ms. Walsh, we reject NCS' contention that she was not engaged in statutorily protected activity or that she did not tell any NCS official that

---

[6] The MHRA contains a similar prohibition and Courts apply the same analytical framework to both statutes. See Minn. Stat. § 363.03 (7)(1); Hubbard v. United Press Int'l Inc., 330 N.W.2d 428, 444 (Minn. 1983).

she believed Ms. Mickelson's conduct to be violative of Title VII or the MHRA. See Breitenfeldt v. Long Prairie Packing Co., Inc., 48 F. Supp. 2d 1170, 1177 (D. Minn. 1999) (holding that an employee need not mention the specific statute which the alleged discriminatory conduct may violate). This Court believes that Ms. Walsh engaged in "protected conduct" under Title VII when she complained about Ms. Mickelson's differential treatment to the Personnel Department. With respect to the second element, there is sufficient evidence in the record supporting Ms. Walsh's complaint of an adverse employment action after her complaint. For example, Ms. Walsh presented evidence that upon speaking to Mr. McRath, she was led to believe that he would speak to Ms. Mickelson about the complaint and later that same day, Ms. Mickelson apparently reported that Ms. Walsh was not performing satisfactorily. This alone may have been insufficient to support Ms. Walsh's claim of an adverse employment action; however, two days after her complaint, she was assigned an increased work load without a corresponding increase in salary or title and was subjected to increased criticism and disparaging remarks about being pregnant. See Williams v. City of Kansas City, 223 F.3d 959, 964 ( 8th Cir. 2000) (noting that a change in responsibilities may be adverse employment action); Hocevar v. Purdue Frederick Co., 223 F.3d 721, 727 (8th Cir. 2000).

Although Ms. Walsh does not present any direct evidence of a causal link between her complaint and the adverse employment action, this element may be "demonstrated indirectly by evidence of circumstances that justify an inference of retaliatory motive, such as a showing that the employer has actual or imputed knowledge of the protected activity [ i.e., the complaint,] and the adverse employment action follows closely in time." See Bergstrom-Ek, 153 F.3d 851. NCS does not dispute the fact that Mr. McRath actually spoke to Ms. Mickelson about the complaint and

therefore, it is clear that NCS had actual knowledge of the protected activity and the report of Ms. Walsh's poor performance, increased work load and criticism followed closely in time. All these events occurring in close proximity are, at the very least, sufficient to raise a question of fact regarding their motivation and therefore preclude summary judgment.

Based upon the undisputed evidence, this Court believes that a reasonable jury could conclude that Ms. Walsh has established a prima facie case of reprisal discrimination. In keeping with the McDonnell-Douglas analysis, NCS has failed to offer a legitimate and non-retaliatory rationale for Ms. Mickelson's actions and has failed to satisfy its burden by demonstrating that unlawful reprisal occurred in the guise of legitimate conduct. Accordingly this Court will recommend that NCS' Motion for Summary Judgment with respect to this claim be denied.

**d. Denial of Benefits under the Family Medical Leave Act.**

The FMLA allows eligible employees at least twelve weeks of unpaid leave per year for the birth of a child or if an employee or an immediate family member has a serious medical condition. See 29 U.S.C. §§ 2601-2654, 2612(a)(1)(D). The definition of a "serious medical condition" includes an "illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(B).

This Court rejects Ms. Walsh's contention that she was denied intermittent leave in violation of the FMLA. Nothing in the record suggests that NCS ever denied her leave for her pregnancy or medical appointments in violation of the FMLA. In fact the record reveals that she was: (1) allowed more than twelve weeks off for the birth of her son; (2) restored to her same position after her return ; (3) granted time off for medical appointments even though she had to make up any partial-day absences; and (4) paid during those absences.

In viewing the evidence in the light most favorable to Ms. Walsh, this Court believes that there are no genuine issues of material fact concerning whether NCS denied Ms. Walsh leave in violation of the FMLA. Accordingly, this Court will recommend that the Motion for Partial Summary Judgment with respect to the denial of FMLA benefits be granted.

**e. Discrimination or Retaliation under the Family Medical Leave Act.**

The FMLA protects an employee from discrimination based on her exercise of rights guaranteed by the FMLA. See 29 U.S.C. § 2615(a)(1) & (2). "An employer is prohibited from discriminating against employees . . . who have used FMLA leave" or opposing or complaining about any unlawful practice under the FMLA. 29 C.F.R. § 825.220(c). An employer cannot consider the taking of FMLA leave as a negative factor in employment actions. See id. When a plaintiff alleges a retaliatory discharge under the FMLA, the plaintiff must establish that the employer engaged in intentional discrimination. See Scheidecker v. Arvig Enterprises, Inc., 122 F. Supp. 2d 1031, 1044 (D. Minn. 2000). In the absence of direct evidence of discrimination, an intent-based FMLA claim, like other cases involving unlawful discrimination, is analyzed under the McDonnell Douglas burden-shifting framework. Id. (citing King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir.1999)).

The Eighth Circuit Court of Appeals has not yet articulated how district courts are to analyze discrimination or retaliation claims under the FMLA. See Smith v. Datacard Corp., 9 F. Supp. 2d 1067, 1075 (D. Minn. 1998). The Eleventh Circuit has held that:

> in order to make out a prima facie case, a plaintiff must show that (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions. See Morgan v. Hilti, Inc., 108 F.3d 1319, 1325 (10th Cir.1997); see also Dodgens v. Kent Mfg. Co., 955 F. Supp. 560, 566 (D.S.C. 1997). Alternatively, other courts

> follow a four-part test for determining whether a plaintiff has established a prima facie case, requiring proof that: (1) plaintiff is a member of a protected class, i.e., qualifying for FLMA rights; (2) adverse [employment] action; (3) plaintiff is qualified for the position; and (4) more favorable treatment of employees not exercising FLMA rights. See Petsche v. Home Fed. Sav. Bank, N. Ohio, 952 F. Supp. 536, 538 (N.D. Ohio 1997).

Smith v. Datacard Corp., 9 F. Supp. at 1075. Without deciding which test should control, this Court finds that an application of the McDonnell Douglas analysis to Ms. Walsh's claim that NCS discriminated and/or retaliated against her for exercising rights guaranteed by the FMLA reveals genuine issues of material fact similar to those raised in Section c, supra. Because of the similarities between Ms. Walsh's FMLA claim and her Title VII and the MHRA reprisal claims, summary judgment on her FMLA claim is also inappropriate. See supra, § c.

**f. Reprisal Under the Minnesota Parenting Leave Act.**

The MPLA mandates that an employer "must" grant an unpaid leave of absence to a parent "in conjunction with the birth or adoption of a child." Minn. Stat. § 181.941 (1). The Act requires that an employee be allowed to return to a former position or "a position of comparable duties, number of hours, and pay." Minn. Stat. § 181.942 (1)(a). The Act also prohibits retaliation against an employee for requesting or taking leave. See Minn. Stat. § 181.941 (3).

At the outset, this Court rejects NCS' contention that Ms. Walsh is not a covered employee under the MPLA because she did not request pregnancy leave under any section of the Act. The MPLA defines "employee" as

> a person who performs services for hire for an employer from whom leave is requested under sections 181.940 to 181.944 for: (1) at least 12 consecutive months immediately preceding the request; and (2) for an average number of hours per week equal to one-half the full-time equivalent position in the employee's job classification as defined by the employer's personnel policies or practices or pursuant to the provisions of a collective bargaining agreement, during those 12 months.

Minn. Stat. § 181.940. Ms. Walsh commenced employment with NCS in May 1993, and approximately four years later requested maternity leave in April 1997. Since Ms. Walsh was employed by NCS for more than one full year before requesting maternity leave, she was, by definition, entitled to leave under either the FMLA or the MPLA. Moreover, NCS has not cited any case law supporting its contention that Ms. Walsh was required to specifically invoke the MPLA in her request for pregnancy leave. In fact, this Court's careful research has not revealed any such case law.

This Court finds that Ms. Walsh's claim that NCS retaliated against her for exercising rights guaranteed by the MPLA by denying her unlimited sick leave and subjecting her to increased criticism, scrutiny and public disparaging remarks reveals genuine issues of material fact similar to those raised in Section e, supra. Because of the similarities between Ms. Walsh's FMLA and MPLA claims, summary judgment on her MPLA claim is also inappropriate.

**g. Minnesota Sick or Injured Child Care Leave Act.**

The Minnesota Sick or Injured Child Care Leave Act ("MSICLA") provides that

> [A]n employee may use personal sick leave benefits provided by the employer for absences due to an illness of the employee's child for such reasonable periods as the employee's attendance with the child may be necessary, on the same terms the employee is able to use sick leave benefits for the employee's own illness. This section applies only to sick leave benefits payable to the employee from the employer's general assets.

Minn. Stat. § 181.9413 (2000). In the instant case, Ms. Walsh argues that NCS violated the Act because while NCS gave other employees unlimited sick time, Ms. Mickelson required her to off-set any partial day absences taken for medical reasons. Although there is little case law interpreting the

application of this statute[7], a plain reading shows that it merely prohibits an employer from establishing a different policy with respect to an employee's use of sick leave to care for a child or caring for the employees own illness. Although the Court does not approve of such conduct, the statute does not preclude the unequal treatment of employees with respect to their use of sick leave. Ms. Walsh is merely trying to recast her discrimination claim to establish a violation of the MSICLA.

Accordingly, this Court believes that there are no genuine issues of material fact regarding whether NCS violated the MSICLA and will recommend that NCS' Motion for Summary Judgment on the MSICLA claim be granted.

## III. RECOMMENDATION

Based upon the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant NCS' Motion for Partial Summary Judgment [#60] be **GRANTED in part and DENIED in part** as follows:

(1) Insofar as the Motion seeks Summary Judgment with respect to Ms. Walsh's claim of Constructive Discharge under Title VII and the Minnesota Human Rights Act, it should be **DENIED**;

(2) Insofar as the Motion seeks Summary Judgment with respect to Ms. Walsh's claim of Discriminatory Failure to Hire under Title VII and the Minnesota Human Rights Act, it should be **DENIED**;

(3) Insofar as the Motion seeks Summary Judgment with respect to Ms. Walsh's claims of Reprisal under the MHRA and Title VII, it should be **DENIED**;

(4) Insofar as the Motion seeks Summary Judgment with respect to Ms. Walsh's claim

---

[7] See Wojcik v. Bandin Paper Co., No. C4-92-878, 1992 WL 358751 (Minn. Ct. App. Nov. 23, 1992) (holding that the Act only applies to sick leave benefits paid from the employer's general assets).

of Denial of Benefits under the Family Medical Leave Act, it should be **GRANTED**;

(5) Insofar as the Motion seeks Summary Judgment with respect to Ms. Walsh's claim of Discrimination or Retaliation under the Family Medical Leave Act, it should be **DENIED**;

(6) Insofar as the Motion seeks Summary Judgment with respect to Ms. Walsh's claim of Reprisal Under the Minnesota Parenting Leave Act, it should be **DENIED**;

(7) Insofar as the Motion seeks Summary Judgment with respect to Ms. Walsh's claim of Violation of the Minnesota Sick or Injured Child Care Leave Act, it should be **GRANTED**.

DATED: July 10, 2001

Franklin L Noel
FRANKLIN L. NOEL
Chief Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, within ten days of service of this Report and Recommendation, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service of the objections. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Circuit Court of Appeals.

# Please forward this announcement to the recipient of this fax.

---

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500